UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>U.S. Attorney's Office<br>555 Fourth Street, NW<br>Washington, DC 20530,<br><br>    Plaintiff,<br><br>  v.<br><br>$599,930.00 OF FUNDS ASSOCIATED<br>WITH COOPERATING COMPANY 1,<br><br>$845,130.00 OF FUNDS ASSOCIATED<br>WITH APEX CHOICE LTD.,<br><br>$1,722,723.00 OF FUNDS ASSOCIATED<br>WITH YUANYE WOOD CO. LTD.,<br><br>    Defendants In Rem, and<br><br>APEX CHOICE LTD.,<br>14/F, CHUN WO COMMERCIAL CENTRE,<br>25 WING WO STREET, CENTRAL,<br>HONG KONG<br><br>YUANYE WOOD LTD.,<br>NO 402 JIXINZUTUAN 10 XINQIAOTOU<br>WENZHOU, CHINA<br><br>    Defendants. | Civil Action No. 18-2746 |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM* AND CIVIL COMPLAINT

COMES NOW, Plaintiff, the United States of America, by and through the United States

Attorney for the District of Columbia, and brings this verified complaint for forfeiture in a civil

action *in rem* against $599,930.00 associated with a third-party cooperating company in Singapore

("Cooperating Company 1") ("Defendant Funds 1"), $845,130.00 associated with Defendant Apex

Choice Ltd., ("Apex Choice") ("Defendant Funds 2"), and $1,722,723.00 associated with Defendant Yuanye Wood Ltd., ("Yuanye Wood") ( "Defendant Funds 3"), all funds collectively referred to as the "Defendant Funds", and civil complaint *in personam* against Defendants Apex Choice and Yuanye Wood (collectively, the "Defendant Entities") and alleges as follows:

## NATURE OF ACTION AND THE PARTIES

1.      This action arises out of an investigation by the Federal Bureau of Investigation ("FBI") of a scheme by North Korean banks sanctioned by the U.S. Department of the Treasury to launder U.S. dollars through the United States on behalf of sanctioned entities in the Democratic People's Republic of Korea ("DPRK" or "North Korea").

2.      As described in detail below, sanctioned state-run North Korea banks have used a host of companies in order to access the U.S. financial system and evade the U.S. sanctions imposed on these banks and their sanctioned affiliates.

3.      Additionally, companies that contract with North Korean entities, or make arrangements to receive funds from sanctioned state-run banks, frequently set up their own front companies to receive funds related to North Korean contracts.

4.      This action relates to U.S. dollar transfers (described below) that Cooperating Company 1, Apex Choice, and Yuanye Wood transferred to known North Korean financial facilitators.

5.      These transfers were in violation of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701, *et seq.*, the prohibitions of the North Korea Sanctions and Policy Enhancement Act of 2016 ("NKSPEA"), codified at 22 U.S.C. § 9201, *et seq.*, the conspiracy statute, codified at 18 U.S.C. § 371, and the federal money laundering statute, codified at 18 U.S.C. § 1956(a)(2)(A), (h).

6.      The Defendant Funds are subject to forfeiture pursuant to: 18 U.S.C. §§ 981(a)(1)(C), 18 U.S.C. § 981(a)(1)(I), and 18 U.S.C. § 981(a)(1)(A).

7.      The Defendant Funds are subject to a money laundering monetary penalty pursuant to 18 U.S.C. § 1956(b).

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1355.

9.      Venue is proper pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1391(b)(2) because the acts and omissions giving rise to the forfeiture took place in the District of Columbia.  The Defendant Funds are currently held in a bank account in the United States.  The Defendant Entities and co-conspirators failed to seek or obtain licenses from the Department of the Treasury's ("Treasury's") Office of Foreign Asset Control ("OFAC"), which is located in Washington, D.C., to conduct transactions for which licenses were required under United States law.

10.     Cooperating Company 1 is a corporation purportedly headquartered in Singapore. As detailed herein, Cooperating Company 1 purposefully directed its illicit actions towards the United States by routing funds through bank accounts located in the United States.

11.     Apex Choice is a corporation purportedly headquartered in Hong Kong. As detailed herein, Apex Choice purposefully directed its illicit actions towards the United States by routing funds through bank accounts located in the United States.

12.     Yuanye Wood is a corporation purportedly headquartered in China. As detailed herein, Yuanye Wood purposefully directed its illicit actions towards the United States by routing funds through bank accounts located in the United States.

## STATUTORY FRAMEWORK

### I.     IEEPA

13.    This investigation relates to violations of regulations issued pursuant to IEEPA. By virtue of IEEPA, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. *See* 50 U.S.C. §§ 1701, 1702. Pursuant to that authority, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions, including financial transactions, with North Korea by U.S. persons or involving U.S.-origin goods.

14.    Pursuant to 50 U.S.C. § 1705(a), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and pursuant to Section 1705(c), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 18 U.S.C. § 371 criminalizes a conspiracy to commit offenses against the United States.

15.    On November 14, 1994, pursuant to IEEPA, the National Emergencies Act, and the Arms Export Control Act, the President issued Executive Order ("E.O.") 12,938 finding that "the proliferation of nuclear, biological and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

16.    By the authority vested in the President by IEEPA and the National Emergencies Act, on or about June 28, 2005, the President signed Executive Order ("E.O.") 13,382, which takes additional steps with respect to the national emergency described and declared in E.O. 12,938, to target proliferators of weapons of mass destruction ("WMD") and their support networks and deny

designated WMD proliferators access to the U.S. financial and commercial system.  As part of E.O. 13,382, a number of North Korean entities were identified by the President as WMD proliferators and listed in the Annex to E.O. 13,382 as being subject to U.S. sanctions.  This blocking program initially applied to eight organizations in North Korea, Iran, and Syria.

17.     On April 13, 2009, the Treasury Department promulgated the Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. § 544.101, et seq., (the "WMDPSR"), which blocked, as a function of law, any property and interests of property, belonging to individuals and entities listed in or designated pursuant to E.O. 13,382, who were concurrently placed on Treasury Department's Office of Foreign Assets Control's ("OFAC") Specially Designated Nationals and Blocked Persons List (the "SDN list").  *See* 31 C.F.R. § 544.201(a).  The terms "property" and "property interests" include but are not limited to money, bank deposits, guarantees, and other financial instruments.  *See* 31 C.F.R. §544.308.

18.     Pursuant to 31 C.F.R. § 544.405, no U.S. person may provide financial or other services for the benefit of a person or entity added to the SDN list pursuant to E.O. 13,382, except as authorized or licensed by OFAC.  Additionally, a non-U.S. person may not cause the provision of financial or other services by a U.S. person or in the United States for the benefit of a person or entity so designated under these sanctions, except as authorized or licensed by OFAC.  *See* 31 C.F.R. § 544.405; 50 U.S.C. § 1705.

19.     On March 15, 2016, the President signed E.O. 13,722, which authorized the Secretary of the Treasury, in consultation with the Secretary of State, to block all property and interests in property of persons operating in certain industries in the North Korean economy, including transportation, mining, energy, and financial services.

20.     In March 2013, OFAC designated North Korea's Foreign Trade Bank pursuant to E.O. 13,382.  In December 2016, OFAC designated North Korea's Koryo Credit Development Bank pursuant to E.O. 13,722.

## II.    NKSPEA

21.     On February 18, 2016, the President signed into law NKSPEA.

22.     Within NKSPEA, Congress found that "[t]he Government of North Korea has been implicated repeatedly in money laundering[.]"  22 U.S.C. § 9201(a)(3).

23.     NKSPEA states that the President "shall designate" any person that "knowingly, directly or indirectly, engages in money laundering . . . that supports the Government of North Korea or any senior official or person acting for or on behalf of that Government." 22 U.S.C. § 9214(a)(6).

24.     On August 2, 2017, the President signed the Countering America's Adversaries Through Sanctions Act, Pub. L. No. 115-44, which amended NKSPEA to add a new Section 201A, requiring U.S. financial institutions to prevent correspondent accounts from "being used by the foreign financial institution to provide significant financial services indirectly to any person, foreign government, or financial institution designated under section 104," 22 U.S.C. § 9221a, and requiring the designation under Section 104(a) of any person who knowingly, directly or indirectly, maintains a correspondent account with any North Korean financial institution, 22 U.S.C. § 9214(a)(14).

## III.   BANK SECRECY ACT CRIMINALIZES CORRESPONDENT BANKING WITH NORTH KOREAN FINANCIAL INSTITUTIONS

25.     According to the Treasury Department, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering

requirements set forth in the Bank Secrecy Act as well as sanctions programs administered by OFAC. The Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system from illicit use.

26.     Nearly all U.S. dollar transactions conducted by foreign financial institutions are processed via correspondent bank accounts in the United States. Correspondent bank accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of U.S. dollar transactions.

27.     The Bank Secrecy Act broadly defines foreign financial institutions to include dealers of foreign exchange and money transmitters in a manner not merely incidental to their business. *See* 31 C.F.R. § 1010.605(f).

28.     Section 311 of the USA PATRIOT Act, codified at 31 U.S.C. § 5318A as part of the Bank Secrecy Act, gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. A Section 311 finding and the related special measure are implemented through various orders and regulations incorporated into 31 C.F.R. Chapter X. In order to protect the integrity of the U.S. financial system, a special measure imposed under Section 311 prevents financial institutions from causing U.S. financial institutions to engage in any type of financial transaction with an entity within the jurisdiction deemed an area of money laundering concern.

29.     On June 1, 2016, in accordance with section 201 of NKSPEA, FinCEN issued a Notice of Finding for a Section 311 designation of North Korea. Specifically, FinCEN's finding deemed *the entire North Korean financial sector* as a jurisdiction of primary money laundering concern.  *See* Federal Register, Vol. 81, No. 107 (June 3, 2016).

30.     In November 2016, FinCEN published a final rule implementing the most severe special measure against the entire North Korean financial sector. *See* Federal Register, Vol. 81, No. 217 (Nov. 9, 2016); 31 C.F.R. § 1010.659. The special measure bars U.S. financial institutions from maintaining a correspondent account for any North Korean financial institution or any party acting on its behalf. A second special measure requires covered financial institutions to exercise "enhanced due diligence" and take reasonable steps to not process a transaction for the correspondent account of a foreign bank in the United States if such a transaction involves a North Korean financial institution. Because of the finding that the entire North Korea financial sector was a primary money laundering concern, FinCEN cut all North Korean financial institutions -- and entities acting on their behalf -- off from any trade in U.S. dollar transactions via correspondent banking.  The Chairman of the House Foreign Affairs Committee stated that the Section 311 designation "impacts all financial institutions, anywhere, who now have a choice to make between doing business with North Korea and being cut off from financial transactions with the United States and the international financial system."

31.     A violation of the Section 311(b) special measure, codified at 31 U.S.C. § 5318A(b), or of the regulations published at 31 C.F.R. § 1010.659, is punishable criminally pursuant to 31 U.S.C. § 5322.

## I.     MONEY LAUNDERING VIOLATIONS

32.     18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

33.     18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds, *inter alia*, to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

34.     Pursuant to 18 U.S.C. § 1956(c)(7)(A), the term "specified unlawful activity," includes violations of 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1344 (relating to bank fraud).

a.      As noted above, U.S. financial institutions are barred, pursuant to the section 311(b)(5) special measure, from engaging in financial transactions with North Korean financial institutions.  As the FinCEN finding noted, North Korea makes "extensive use of deceptive financial practices, including the use of shell and front companies to obfuscate the true originator, beneficiary, and purpose behind its transactions," in part "to evade international sanctions."  *See* 81 Fed. Reg. 78,716, 78,718.  North Korean entities have attempted to circumvent the section 311(b)(5) ban by using foreign front companies to engage in financial transactions on their behalf.  These financial transactions would be in violation of 22 U.S.C. § 9214 if the parties openly acknowledged the involvement of the North Korean entities.  Instead, the true North Korean counterparties to these transactions remain concealed in order to allow the U.S. dollars to be processed.

b.      This scheme, and these types of transactions, constitute wire fraud because the false transactions occur via wire, and are done in part to deceive and defraud the United State government, which has forbidden such transactions.

c. This scheme, and these types of transactions, also constitute wire fraud and bank fraud because the false transactions occur via wire, and are done in part to deceive and defraud U.S. financial institutions, which are barred from conducting such transactions, and could face civil and criminal penalties for not detecting these transactions.

d. But for this scheme to defraud U.S. correspondent banks, North Korean foreign financial institutions would not be able to engage in U.S. dollar transactions.

35. Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA (including violations of any license, order, regulation, or prohibition issued under IEEPA) and conduct prohibited under section 104(a) of NKSPEA (relating to prohibited activities with respect to North Korea).

a. One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of OFAC's SDN list. The SDN list contains a number of persons (individuals and entities) designated under OFAC's Non-Proliferation Sanctions and North Korea Sanctions programs, including North Korean weapons trading firms, North Korean Government officials, North Korean financial institutions, and nationals of other foreign countries supporting North Korea's weapons of mass destruction programs.

b. Criminals are often aware of the SDN list and that U.S. financial institutions are obligated to conduct due diligence of their clients, in an attempt to prevent sanctioned parties from transacting in U.S. dollars. As a result, criminals often employ front companies to engage in laundered transactions on their behalf, in order to prevent banks from learning that the sanctioned entity is a party to the transaction.

      c.     North Korean financial facilitators in particular are aware of these designation lists and of U.S. financial institutions' due diligence obligations. In turn, these North Korean entities have a documented practice of using front companies to avoid the imposition of designations and blockings, which may occur pursuant to IEEPA and NKSPEA.  These opaque U.S. dollar transactions by front companies promote IEEPA and NKSPEA violations, by preventing the imposition of sanctions. That is, if the transactions were not conducted in a fashion to conceal the involvement of the North Korean entities, the transactions would meet the criteria for designation of the involved parties. But, because the parties conceal their laundering of funds, designations are impeded. Financial transactions by North Korean financial facilitators facilitate a conspiracy to circumvent designations under IEEPA and NKSPEA.

## V.     FORFEITURE

36.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of IEEPA is subject to civil forfeiture.

37.     Pursuant to 18 U.S.C. § 981(a)(1)(I), any property, real or personal, that is involved in a violation or attempted violation, or which constitutes or is derived from proceeds traceable to a prohibition imposed pursuant to section 104(a) of NKSPEA, is subject to civil forfeiture. NKSPEA allows for forfeiture of conduct other than a violation of NKSPEA.  Specifically, the first part of the statute focuses on violations of the statute; however, the second prong mandates forfeiture for the broad prohibitions imposed by section 104(a).

38.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture.

39.     Forfeiture pursuant to violations of the above money laundering statute and NKSPEA apply to a larger class of property than forfeiture under 18 U.S.C § 981(a)(1)(C), because such forfeitures are not limited to proceeds of the crime. Rather, these forfeitures include property "involved in" the crime or the attempted crime, which can include "clean" or "legitimate" money that is commingled with "tainted" money derived from illicit sources.

## VI.    MONETARY PENALTY

40.     Pursuant to 18 U.S.C. § 1956(b), whoever conducts or attempts to conduct a transaction described in §§ 1956(a)(1) or (a)(3), or a transportation, transmission, or transfer described in § 1956(a)(2), is liable to the United States for a civil penalty of not more than the greater of the value of the property, funds, or monetary instruments involved in the transaction or $10,000.

## **FACTUAL ALLEGATIONS**

## I.    **THE NORTH KOREAN FINANCIAL SECTOR LAUNDERS FUNDS FOR SANCTIONED ENTITIES**

### A.    **Background**

41.     The focus of this action is the money laundering activities of sanctioned state-run North Korean banks and co-conspirator unsanctioned companies located outside of North Korea that act as financial institutions by transacting in U.S. dollars on behalf of the North Korean banks ("North Korean financial facilitators").  The money laundering conspiracy benefits entities in North Korea for the purpose of advancing procurement and financial activity for the government of North Korea in contravention of U.S. and United Nations prohibitions on such activity.

42.     For example, on March 2, 2016, the United Nations Security Council unanimously approved resolution 2270. Paragraph 33 of that resolution requires U.N. member states to prohibit financial institutions from establishing or maintaining correspondent relationships with North Korean banks.

43.     The United States House of Representatives' Foreign Affairs Committee released a report that concluded that North Korea remains dependent on its access to the international financial system, which in turn reflects a dependency on the U.S. dollar. *See* House Rept. 114–392, at 18 (January 11, 2016).  This is because "[t]he vast majority of international transactions are denominated in dollars, the world's reserve currency." *Id.*  North Korea continues to transact in U.S. dollars for many of its international and domestic business transactions, by hiding "its dollar transactions within the dollar-based financial system using false names, shell companies, and other deceptive practices." *Id.*

**B.      North Korean Financial Institutions Continue To Launder U.S. Dollars.**

44.     The North Korean financial sector is comprised of state-controlled financial institutions that use "front companies to conduct international financial transactions that support the proliferation of WMD and the development of ballistic missiles in violation of international and U.S. sanctions," and are subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism [] controls."  81 Fed. Reg. at 78,715.

45.     FinCEN's Section 311 action included a finding that North Korean financial institutions continued to access the U.S. financial system, in violation of the U.S. sanctions.  The finding further stated that millions of U.S. dollars' worth of illicit transactions were flowing through U.S. correspondent accounts in spite of the sanctions because of the coordinated use of money laundering techniques to conceal North Korea's involvement and the processing of the payments by North Korean financial institutions.  Specifically, FinCEN found that:

13

North Korea continues to advance its nuclear and ballistic missile programs in violation of international treaties, international censure and sanctions measures, and U.S. law. North Korea does this using an extensive overseas network of front companies, shell companies, joint ventures, and opaque business relationships. North Korea conducts almost no banking in true name in the formal financial system given that many of its outward facing agencies and financial institutions have been sanctioned by the United States, the United Nations, or both.

While none of North Korea's financial institutions maintain correspondent accounts with U.S. financial institutions, *North Korea does have access to the U.S. financial system through a system of front companies, business arrangements, and representatives* that obfuscate the true originator, beneficiary, and purpose of transactions. We assess that *these deceptive practices have allowed millions of U.S. dollars of [North Korean] illicit activity to flow through U.S. correspondent accounts.*

Moreover, although U.S. and international sanctions have served to significantly isolate North Korean banks from the international financial system, the North Korean government continues to access the international financial system to support its [weapons of mass destruction] and conventional weapons programs. This is made possible through its use of aliases, agents, foreign individuals in multiple jurisdictions, and a long-standing network of front companies and North Korean embassy personnel which support illicit activities through banking, bulk cash, and trade. Front company transactions originating in foreign-based banks have been processed through correspondent bank accounts in the United States and Europe.

81 Fed. Reg. at 35,442 (emphasis added).

46.     In its 2017 annual report, the Panel of Experts established by the U.N. Security Council to investigate compliance with sanctions against North Korea ("Panel of Experts") noted the central role of North Korean banks in allowing North Korean entities to continue to illegally access the U.S. financial system. Specifically, the report states that:

[T]he Democratic People's Republic of Korea has continued to access the international financial system to support its activities. Financial networks of the Democratic People's Republic of Korea have adapted to these sanctions, using evasive methods to maintain

14

access to formal banking channels and bulk cash transfers to facilitate prohibited activities. . . .

The Panel has identified multiple ways in which *the financial institutions and networks of the Democratic People's Republic of Korea access the international banking system* to engage in activities in violation and/or evasion of the provisions of the resolutions:

- *Banks of the Democratic People's Republic of Korea, including designated banks*, hold correspondent or payable-through accounts with foreign banks

- Banks of the Democratic People's Republic of Korea form joint ventures with foreign companies

- Foreign companies establish banks inside the Democratic People's Republic of Korea

- *Banks of the Democratic People's Republic of Korea, including designated banks, maintain representative offices abroad.*

2017 Report of the Panel of Experts, at 79-80 (emphasis added).

47.     The front companies that launder funds on behalf of sanctioned North Korean banks are supporting sanctioned North Korean end users, including North Korean military and North Korean weapons programs. In the 2013 designation of North Korea's Foreign Trade Bank ("FTB"), the Treasury Department noted that the North Korean bank was "a key financial node in North Korea's WMD apparatus." https://www.treasury.gov/press-center/press-releases/Pages/jl1876 .aspx.  On June 1, 2016, the Treasury Department again noted that "North Korea uses *state-controlled financial institutions* and front companies to conduct international financial transactions that support the proliferation and development of [weapons of mass destruction] and ballistic missiles." https://www.treasury.gov/press-center/press-releases/Pages/jl0471.aspx (emphasis added).

15

**C.**     **FTB is a Primary Vehicle in North Korea's Illicit Money Laundering Network**

48.     U.N. and OFAC sanctions designation publications reveal that FTB is responsible for handling foreign currency transactions for North Korea's government ministries and their subordinate trading companies.  Reforms undertaken in the early and mid-2000s codified FTB's role and relevance in North Korea's banking industry.  In approximately 2000, FTB developed and instituted an inter-bank clearing system in North Korea.  After the institution of this system, North Korean banks were generally required to maintain currency-clearing accounts at FTB.  These accounts are used to clear transactions among North Korea's commercial banks.  This reform, in effect, channeled transactions from North Korea's arms exports and luxury goods imports through FTB.

49.     In the March 2013 designation of FTB, OFAC noted that FTB is a state-owned bank and "acts as North Korea's primary foreign exchange bank."  The designation further noted that North Korea uses FTB to facilitate millions of dollars in transactions on behalf of actors linked to its proliferation network.

50.     FTB continues to act as the umbrella bank for foreign currency transactions in North Korea. In fact, FTB sets the official exchange rate for North Korean currency to foreign currency.

51.     The FinCEN Section 311 action made specific findings as to FTB, that is:

> The following examples are representative of the activities of FTB and its front companies. Between 2008 and 2012, FTB used front companies in multiple countries to make and receive payments equivalent to tens of millions of U.S. dollars. In 2011, an FTB front company was involved with U.S.-designated [Korea Kwangson Banking Corp.] and Korea 5 Trading Corporation, a subordinate of U.S. and UN-designated Korea Ryonbong General Corporation, in financial dealings totaling several millions of U.S. dollars. *The same FTB front company processed transactions through U.S. correspondent accounts as recently as April 2014.*

81 Fed. Reg. at 35,445 (emphasis added).

52.     This FinCEN report alone demonstrates that FTB has illegally laundered "millions of U.S. dollars" in violation of the U.S. sanctions.  Moreover, this report shows that even prior to designation, FTB was laundering U.S. dollar transactions on behalf of sanctioned North Korean entities.

### D.     North Korean Entities Continue to Launder U.S. Dollars Via Front Companies

53.     Designated North Korean companies continue to transact in U.S. dollars via front companies.  The Panel of Experts noted that transactions originating in foreign banks have been processed through correspondent accounts in the United States via front companies, which are "often registered by non-nationals, who also use indirect payment methods and circuitous transactions dissociated from the movement of goods or services to conceal their activity."  2016 Report of the Panel of Experts, at 62.  North Korean front companies are instructed to strip all information tying their U.S. dollar transactions to North Korea, in order to prevent the Treasury Department from blocking the transactions.  *Id.* at 66.

54.     This use of front companies was recently highlighted by the Panel of Experts. The report stated that:

> The financial sanctions notwithstanding, the Democratic People's Republic of Korea continues to gain access to and exploit the global international financial system (including banking and insurance) through reliance on aliases, agents, foreign individuals in multiple jurisdictions, and a long-standing network of front companies and embassy personnel, all of which support illicit activities through banking, bulk cash and trade.

2016 Report of the Panel of Experts, at 62.

55.     FinCEN noted that "one way that North Korean financial institutions and networks access the international banking system is through trading companies, including designated

17

entities, that are linked to North Korea. These trading companies open bank accounts that perform the same financial services as banks, such as maintaining funds on deposit and providing indirect correspondent bank account services." *Proposal of Special Measure Against Bank of Dandong as a Financial Institution of Primary Money Laundering Concern*, 82 Fed. Reg. 31,537 (July 7, 2017).

56.     North Korean financial facilitators frequently establish and maintain offshore U.S. dollar accounts for the purposes of remitting wire transfers denominated in U.S. dollars on behalf of sanctioned North Korean entities and their related front companies. *See, e.g.*, 81 Fed. Reg. at 35,442 ("While none of North Korea's financial institutions maintain correspondent accounts with U.S. financial institutions, North Korea does have access to the U.S. financial system through a system of front companies, business arrangements, and representatives that obfuscate the true originator, beneficiary, and purpose of transactions. We assess that these deceptive practices have allowed millions of U.S. dollars of North Korean illicit activity to flow through U.S. correspondent accounts."). These U.S. dollar wire transfers originate from financial institutions located outside the United States, which clear them through the United States using established correspondent banking relationships with financial institutions in the United States.

57.     Once the wire transfers are cleared through the U.S. financial system, payments are transmitted to offshore U.S. dollar accounts maintained by front companies on behalf of the foreign financial institutions and the North Korean entities and/or parties from whom the North Korean sanctioned entities are seeking goods.

## II.     TARGET FOREIGN FINANCIAL FACILITATORS

58.     The scheme to launder funds is as follows: (1) foreign customers receiving North Korean services and North Korean customers receiving services from foreign companies make or receive payments in U.S. dollars; (2) designated North Korean banks work with covert overseas

foreign branch representatives to establish front companies which can process U.S. dollar payments; and (3) individuals including commodity brokers, front company owners, and/or unauthorized money remitters make arrangements for the North Korean front companies to be paid in U.S. dollars.

59.     These activities are consistent with FinCEN's finding that North Korean banks rely on trading companies to open bank accounts that perform the same financial services as banks. *See Proposal of Special Measure Against Bank of Dandong as a Financial Institution of Primary Money Laundering Concern*, 82 Fed. Reg. 31,537 (July 7, 2017).

A.     **Introduction of North Korean Financial Facilitators**

1.     **Velmur Management Pte. Ltd. ("Velmur")**

60.     On August 22, 2017, OFAC designated Velmur under E.O. 13,722 for operating in the energy industry in the North Korean economy, by importing gasoil to North Korea. OFAC designated Velmur for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, TransAtlantic (described below).  The designation noted that Velmur has sold gasoil to North Korea and that it has attempted to use the U.S. financial system to send millions of dollars in payments on behalf of North Korea-related transactions. "Gasoil" is often used to refer to a distilled petroleum product such as gasoline and/or diesel fuel.

61.     A reliable confidential source ("CS-1") independently revealed that Velmur has been a recipient of U.S. dollar payments on behalf of North Korean entities -- in particular, FTB.

62.     For example, in 2016, a FTB front company made two payments to Velmur totaling more than $250,000.  CS-1 revealed that this company made payments at the direction of FTB. CS-1 revealed that a covert FTB branch representative had ordered two payments by this front company to a third party, which payments directly benefited FTB.

### 2. JSC Independent Petroleum Company ("IPC").

63. On June 1, 2017, OFAC designated IPC, a Russian oil company. The designation noted that IPC had a contract to provide oil to North Korea and reportedly shipped over $1 million worth of petroleum products to North Korea.

64. During the same time period that front companies were wiring payments to Velmur, Velmur remitted money to only one company, IPC. Each payment to IPC included a notation that the payment was related to an invoice for gasoil.

65. Velmur, while registered as a real estate management company, was in fact a North Korean financial facilitator involved with making illicit payments sourced from front companies, as described below, to IPC for the illegal importation of gasoil into North Korea.

### 3. Front Company 1.

66. North Korean banks, including FTB, have used Front Company 1 to facilitate at least $3,299,925.00 in illicit wires, including to a company which is the subject of this complaint, as follows:

| Date | Wire Amount | Party Sending Wire | Party Receiving Wire |
|---|---|---|---|
| May 2, 2017 | $300,000.00 | **Cooperating Company 1** | Front Company 1 |
| May 3, 2017 | $300,000.00 | **Cooperating Company 1** | Front Company 1 |
| May 5, 2017 | $1,199,975.00 | Front Company 1 | Velmur |
| May 9, 2017 | $1,099,975.00 | Front Company 1 | Velmur |
| May 10, 2017 | $999,975.00 | Front Company 1 | Velmur |

67. The above wire payments from Front Company 1 to Velmur noted in the wire reference field, "Prepayment for Gasoil." The above payments were part of the scheme to launder funds involving North Korean banks in order to procure fuel for the North Korean regime.

### 4. Front Company 2.

68.     North Korean banks, including FTB, have used Front Company 2 to facilitate at least $1,550,000.00 in illicit wires, including to a company which is the subject of this complaint, as follows:

| Date | Wire Amount | Party Sending Wire | Party Receiving Wire |
|------|-------------|--------------------|----------------------|
| 05/02/17 | $50,000.00 | **Apex Choice** | Front Company 2 |
| 05/02/17 | $350,000.00 | Front Company 2 | Front Company 1 |
| 05/12/17 | $1,200,000.00 | Front Company 2 | Velmur |

69.     The above wire payment from Front Company 2 to Velmur noted in the wire reference field, "Prepayment for Gasoil."  The above payments were part of the scheme to launder funds involving North Korean banks in order to procure fuel for the North Korean regime.

### 5. Front Company 3.

70.     North Korean banks, including FTB, have used Front Company 3 to facilitate at least $724,983.00 in illicit wires, including to a company which is the subject of this complaint, as follows:

| Date | Wire Amount | Party Sending Wire | Party Receiving Wire |
|------|-------------|--------------------|-----------------------|
| 04/25/17 | $410,000.00 | Front Company 3 | Velmur |
| 05/23/17 | $215,000.00 | **Apex Choice** | Front Company 3 |
| 05/31/17 | $99,983.00 | **Apex Choice Affiliated Company** (described below) | Front Company 3 |

**6.     Dandong Zhicheng Metallic Material Co. ("Dandong Zhicheng")**

71.     On August 22, 2017, OFAC designated Dandong Zhicheng.  The designation noted that Dandong Zhicheng sold, supplied, transferred, or purchased coal or metal, directly or indirectly, from North Korea, and that the revenue may have benefitted the nuclear or ballistic missile programs of the Government of North Korea or the Workers' Party of Korea. The designation also noted that Dandong Zhicheng specializes in the import, export, and transport of steel and anthracite coal, and that it has worked with a number of U.S.-designated entities, including the U.S.-designated Koryo Credit Development Bank and Korea Ocean Shipping Agency.  Dandong Zhicheng allegedly used the foreign exchange received from the end users of North Korean coal to purchase other items for North Korea, including nuclear and missile components.

72.     This Court previously found that Dandong Zhicheng, acting also under the names of Rambo Resource Limited ("Rambo Resource"), Ruizhi Resources Limited ("Ruizhi Resources"), Tin Yee Resourcs Limited ("Tin Yee"), and Shun Mao Mining Co., Limited ("Shun Mao"), (collectively "Dandong Zhicheng Network") had illegally laundered approximately $700 million dollars for the benefit of sanctioned North Korean entities.  *See United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Company, Ltd.*, No. 17-mj-217-BAH, 2017 WL 3233062, at *1 (D.D.C. May 22, 2017).

73.     The Dandong Zhicheng Network laundered payments for FTB.

74.     For example, the Dandong Zhicheng Network wired to Velmur $189,980.00 in July 2016 and $230,000 in September 2016 (detailed below).

### 7.     Front Company 4.

75.     Front Company 4 is a purported food additive company.

76.     North Korean banks, including FTB, have used Front Company 4 to facilitate at least $3,829,963.00 in illicit wires, including to a company which is the subject of this complaint, as follows:

| Date | Wire Amount | Party Sending Wire | Party Receiving Wire |
|---|---|---|---|
| July 29, 2011 | $200,000.00 | Dandong Zhicheng Network | Front Company 4 |
| November 16, 2011 | $500,000.00 | Dandong Zhicheng Network | Front Company 4 |
| November 21, 2011 | $300,000.00 | Dandong Zhicheng Network | Front Company 4 |
| December 8, 2011 | $220,000.00 | Dandong Zhicheng Network | Front Company 4 |
| January 18, 2012 | $300,000.00 | Dandong Zhicheng Network | Front Company 4 |
| January 31, 2012 | $500,000.00 | Dandong Zhicheng Network | Front Company 4 |
| February 2, 2012 | $299,985.00 | Dandong Zhicheng Network | Front Company 4 |
| October 29, 2013 | $149,998.00 | Dandong Zhicheng Network | Front Company 4 |
| June 1, 2016 | $100,000.00 | **Yuanye Wood** | Front Company 4 |
| June 17, 2016 | $100,000.00 | **Yuanye Wood** | Front Company 4 |
| July 18, 2016 | $189,980.00 | Dandong Zhicheng Network | Velmur |
| July 26, 2016 | $200,000.00 | **Yuanye Wood** | Front Company 4 |
| August 12, 2016 | $100,000.00 | **Yuanye Wood** | Front Company 4 |
| September 27, 2016 | $230,000.00 | Dandong Zhicheng Network | Velmur |
| November 9, 2016 | $140,000.00 | Dandong Zhicheng Network | Front Company 4 |
| June 1, 2017 | $200,000.00 | **Yuanye Wood** | Front Company 4 |
| June 13, 2017 | $100,000.00 | **Yuanye Wood** | Front Company 4 |

8.      **Wee Tiong (S) Pte. Ltd. ("Wee Tiong").**

77.     On October 25, 2018, OFAC designated Wee Tiong for laundering money through the U.S. financial system on behalf of North Korea.  Wee Tiong is a Singapore-based commodities trading company.  OFAC noted that Wee Tiong fulfilled millions of dollars in commodities contracts for North Korea.  To do so, Wee Tiong made a concerted effort to obfuscate payment origins and structure transactions to avoid regulatory scrutiny.

78.     Wee Tiong conducted at least $182,934.00 in illicit wires involving the companies which are the subject of this complaint as follows:

| Date | Wire Amount | Party Sending Wire | Party Receiving Wire |
|---|---|---|---|
| Nov 18, 2014 | $100,000.00 | **Apex Choice** | Wee Tiong |
| Sept 28, 2016 | $82,934.00 | **Apex Choice** | Wee Tiong |
| Feb 9, 2017 | $100,000.00 | **Yuanye Wood** | Wee Tiong |

9.      **Front Company 5.**

79.     Front Company 5 is a FTB front company.  CS-1 revealed that a covert FTB branch representative directed the two below-described payments to Velmur.

80.     FTB has used Front Company 5 to facilitate at least $1,195,800.00 in illicit wires as follows:

| Date | Wire Amount | Party Sending Wire | Party Receiving Wire |
|---|---|---|---|
| Nov 14, 2016 | $249,250.00 | Front Company 5 | Front Company 7 (described below) |
| Nov 28, 2016 | $154,550.00 | Front Company 5 | Wee Tiong |
| May 9, 2017 | $385,000.00 | Front Company 5 | Velmur |
| May 9, 2017 | $407,000.00 | Front Company 5 | Velmur |

B.     **Cooperating Company 1's Involvement in Laundering Funds for North Korea**

81.     Cooperating Company 1 made payments to Front Company 1, which was ultimately responsible for making direct payments to Velmur.

82.     Cooperating Company 1 was involved with an unauthorized Chinese money remitter who directed Cooperating Company 1 to make numerous U.S. dollar payments to third party companies who did not otherwise have a business relationship with Cooperating Company 1.

83.     Cooperating Company 1's agreement with the Chinese money remitter allowed Cooperating Company 1 to convert U.S. dollars to Chinese Renminbi, which was the desired denomination of a close business affiliate of Cooperating Company 1 in China.

84.     After Cooperating Company 1 completed the third party payment in U.S. dollars, the Chinese money remitter would make an equivalent deposit in Chinese Renminbi to Cooperating Company 1's business affiliate, who had a bank account in China.

85.     Currency exchange services were normally very expensive; however, the unauthorized money remitter allowed Cooperating Company 1 to convert U.S. dollars to Renminbi at a reduced cost, as long as Cooperating Company 1 would pay third party companies.

86.     Cooperating Company 1 made numerous payments to third parties at the direction of the unauthorized money remitter.  This included $600,000.00 to Front Company 1, which represents Defendant Property 1 (minus the bank fees for the transfer).

87.     Cooperating Company 1 failed to conduct any due diligence of the third parties (e.g., Front Company 1) that the money remitter directed Cooperating Company 1 to pay.

88.     Cooperating Company 1 has agreed to not contest the forfeiture of these funds.

C.    **Apex Choice's Involvement in Laundering Funds for North Korea**

1.    **Company Background**

89.    On or about May 2012, a Chinese National registered Apex Choice in Hong Kong. Apex Choice uses various addresses, which addresses are also used by numerous unrelated companies, none of whom to have a physical office at that shared incorporation address.  Apex Choice purports to be a paraffin wax exporter.  Paraffin wax is commonly derived from petroleum, and has many applications, including in the manufacturing of candles.  North Korea has received petroleum via pipeline from China which has a high paraffin content.

90.    On or about December 12, 2014, the same Chinese national incorporated another company in Hong Kong ("Apex Choice Affiliated Company").

2.    **Payments to Wee Tiong**

91.    A Confidential Source ("CS-3") who has provided reliable information regarding North Korean money laundering activities identified Apex Choice as a company that was used by a North Korean procurement agent to make U.S. dollar payments for sanctioned North Korean banks, including FTB, to Wee Tiong.

92.    According to CS-3, the September 28, 2016 payment for $82,934.00 by Apex Choice to Wee Tiong was for a purchase benefitting North Korea, in which Wee Tiong was the supplier.  CS-3 revealed a communication from the North Korean procurement agent, which confirmed that the payment from Apex Choice was received in September 2016.

93.    As noted above, Apex Choice made at least one additional payment totaling $100,000.00 to Wee Tiong.

### 3. Payments to Front Company 2 and Front Company 3.

94.     As noted above, Apex Choice made at least one payment totaling $50,000.00 to Front Company 2.  Front Company 2 made at least one payment to Velmur totaling $1,200,000.00

95.     As noted above, Apex Choice and the Apex Choice Affiliated Company made at least two payments totaling $314,983.00 to Front Company 3.  Front Company 3 made at least one payment to Velmur totaling $410,000.00.

### 4. Payments to Front Company 6.

96.     Front Company 6 is a purported seafood company.  Known North Korean financial facilitators have wired at least two payments totaling $200,000.00 to Front Company 6.

97.     Apex Choice wired at least two payment totaling $560,000.00 to Front Company 5 ($440,000.00 on March 10, 2015 and $120,000.00 on September 6, 2017).

### 5. Summary of Statements Made to Law Enforcement.

98.     Law enforcement interviewed the Chinese national (described-above) about the laundered payments made by Apex Choice.

99.     The Chinese national indicated in a sworn statement that he purchased paraffin wax from Wee Tiong and Front Company 2 while visiting a warehouse in the Dalian free trade zone in China.  However, neither Wee Tiong nor Front Company 2 sell wax.

100.     The Chinese national separately admitted that Apex Choice created false invoices to make it appear that Apex Choice was purchasing paraffin wax from Wee Tiong and Front Company 2.  These invoices included falsified signatures.  Apex Choice provided these false invoices to its bank to facilitate illicit U.S. dollar payments.

### 6. Summary.

101.     The above-identified illicit payments involving Apex Choice total at least $1,107,917.00.

27

102.    Defendant Funds 2 represent illicit funds that the government seized as part of this scheme.

### D.    Yuanye Wood's Involvement in Laundering Funds for North Korea

#### 1.    Company Background

103.    Yuanye Wood purports to be a wood-sales company based out of Wenzhou, China. Yuanye Wood uses a Seychelles business address for much of its banking with Shanghai Pudong Development Bank.

104.    Yuanye Wood's address in the Seychelles is used by numerous Seychelles-based companies, including an Information Technology consulting firm, an energy company and several other companies that are not related to Yuanye Wood and do not appear to have a physical office at this address.

#### 2.    Payments to Front Company 7

105.    Front Company 7 is a purported fuel bunkering company.  Known FTB front companies have wired at least five payments between October and November 2016 totaling $1,637,522.00 to Front Company 7.

106.    Yuanye Wood wired $100,000.00 on October 18, 2016 to Front Company 7.  This payment by Yuanye Wood referenced "Chilbo."  Mount Chilbo, is the name of a mountain in North Korea, that is located near sites where North Korea has conducted nuclear weapons and missile tests.  It is a name sometimes used by North Korean-controlled business entities.

107.    Chilbo (a/k/a Chilbo Wood Company) was a wood harvesting operation based out of Equatorial Guinea.  Chilbo staffed its logging operations in Equatorial Guinea with North Korea nationals.

108.    Paragraph 17 of United Nations Security Council Resolution 2375, approved on September 11, 2017, bans the exportation of workers by the Government of North Korea, and E.O.

28

13,722 authorizes the President to designate persons involved in the exportation of workers by the government of North Korea.  81 Fed. Reg. 14944.  The Treasury Department has stated that the Government of North Korea uses some of the revenue it derives from the exportation of workers to fund the Munitions Industry Department, which is responsible for its development of ballistic missiles.  In Resolution 2397, approved on December 22, 2017, the U.N. Security Council also acknowledged that "revenue generated from DPRK workers overseas . . . contribute[s] to" North Korea's "nuclear weapons and ballistic missile programs."

109.    The U.S. Department of State has reported that North Korea's exportation of workers often amounts to forced labor, and includes work between 12 and 16 hours per day with one or two rest days per month, unsafe and unsanitary conditions, extreme isolation and control over the workers by North Korean government security officials, and the withholding of wages by the Government of North Korea.

110.    Law enforcement is aware of reports that the North Korean government was sending prisoners to Equatorial Guinea as forced labor, where they worked as loggers or construction workers.

111.    In or about August 2018, Equatorial Guinea reported that it was in the process of repatriating North Korean "laborers," and took steps to cut ties with North Korea in the agricultural sector. This action occurred after a United Nations sanctions National Implementation Report, which specifically named Chilbo as a North Korean forestry company in Equatorial Guinea.

112.    Chilbo directed Yuanye Wood to make the $100,000.00 payment on October 18, 2016 to Front Company 6.  Using this layered transaction allowed Yuanye Wood to pay a North Korean customer in U.S. dollars without the U.S. bank detecting the illicit payment.

### 3. Payments to Wee Tiong

113.    CS-3 revealed a communication from a North Korean procurement agent that confirmed that Yuanye Wood made a payment to Wee Tiong for $99,980.00 on February 9, 2017.

114.    Chilbo directed Yuanye Wood to make the $99,980.00 payment on February 9, 2017 to Wee Tiong.  Using this layered transaction allowed Yuanye Wood to pay a North Korean customer in U.S. dollars without the U.S. bank detecting the illicit payment.

### 4. Payments to Front Company 4

115.    As noted above, the Dandong Zhicheng Network (the sanctioned coal company) wired at least 11 payments between July 2011 and July 2017 totaling $3,029,963.00 to Front Company 4 (the purported food additive company).  Yuanye Wood wired at least six payments totaling $800,000 to Front Company 4 ($100,000.00 on June 1, 2016, $100,000.00 on June 17, 2016, $200,000.00 on July 26, 2016, $100,000.00 on August 12, 2016, $200,000.00 on June 1, 2017, and $100,000.00 on June 13, 2017).

116.    Chilbo directed Yuanye Wood to make the $800,000.00 in payments to Front Company 4.  Using this layered transaction allowed Yuanye Wood to pay a North Korean customer in U.S. dollars without the U.S. bank detecting the illicit payment.

### 5. Summary

117.    Yuanye Wood made over $1,000,000.00 in payments to a Chinese shipping company as part of the scheme to export Chilbo's wood from Equatorial Guinea.

118.    The above-identified illicit payments involving Yuanye Wood total at least $2,000,000.00.

119.    Defendant Funds 3 represent illicit funds that the government seized as part of this scheme.

### III.   SUMMARY OF FACTS GIVING RISE TO FORFEITURE

120.   In sum, the investigation revealed that Cooperating Company 1, Apex Choice, and Yuanye Wood have acted for the benefit of sanctioned North Korean entities, including FTB, by laundering U.S. dollar payments.

121.   These laundered payments went to known North Korean financial facilitators, including Velmur, who used such funds to illegally procure gasoil from IPC, the Dandong Zhicheng Network, and Wee Tiong.

122.   Financial records reveal that Apex Choice and Yuanye Wood directly or indirectly engaged in money laundering that supported the Government of North Korea or any senior official or person acting for or on behalf of that Government, specifically, by wiring out at least $2,500,000 in U.S. dollars subsequent to the enactment of the NKSPEA.

123.   Based on the above facts, Apex Choice and Yuanye Wood fall within the definition of foreign financial institutions under the Bank Secrecy Act, because they act as dealers of foreign exchange and money transmitters in a manner not merely incidental to their business. *See* 31 C.F.R. § 1010.605(f).

124.   Financial records reveal that Apex Choice and Yuanye Wood engaged in at least $3,000,000 in wires via U.S. correspondent banking transactions in spite of the section 311 action barring such transactions.

### COUNT ONE -- FORFEITURE
(Against Defendant Funds; 18 U.S.C. § 981(a)(1)(C))

125.   The United States incorporates by reference the allegations set forth in Paragraphs 1 to 117 above as if fully set forth herein.

126.    FTB, Apex Choice, Yuanye Wood, and others, known and unknown, acted individually and conspired together to conduct the above identified illegal procurements and payments in violation of IEEPA, 50 U.S.C. § 1705, and the conspiracy statute, 18 U.S.C. § 371.

127.    As such, the Defendant Funds are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to substantive violations of IEEPA and a conspiracy to violate IEEPA.

## COUNT TWO -- FORFEITURE
(Against Defendant Funds; 18 U.S.C. § 981(a)(1)(A))

128.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 117 above as if fully set forth herein.

129.    FTB, Apex Choice, and Yuanye Wood acted individually and together to transmit and transfer the Defendant Funds to a place inside the United States from or through a place outside the United States, with the intent to promote the carrying on of violations of the penalties section of IEEPA, 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud), and the prohibited conduct under Section 104(a) of NKSPEA, in violation of 18 U.S.C. § 1956(a)(2)(A).

130.    FTB, Apex Choice, Yuanye Wood, and others, known and unknown, conspired together to commit a violation of 18 U.S.C. §§ 1956(a)(2)(A), in violation of 18 U.S.C. § 1956(h).

131.    As such, the Defendant Funds are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. § 1956(a)(2)(A) and (h), or as any property traceable to such property.

## COUNT THREE -- FORFEITURE
(Against Defendant Funds; 18 U.S.C. § 981(a)(1)(I))

132.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 117 above as if fully set forth herein.

133.    The Defendant Funds are subject to forfeiture to the United States, pursuant to 18

U.S.C. § 981(a)(1)(I), as property, real or personal, that is involved in a violation or attempted

violation, or which constitutes or is derived from proceeds traceable to a prohibition imposed

pursuant to section 104(a) of NKSPEA.

## COUNT FOUR – MONEY LAUNDERING MONETARY PENALTIES
(Against Defendant Apex Choice; 18 U.S.C. § 1956(b))

134.    The United States incorporates by reference the allegations set forth in Paragraphs

1 to 117 above as if fully set forth herein.

135.    Defendant Apex Choice transmitted and transferred at least $1,000,000.00, which

transactions violated the penalties section of IEEPA.

136.    Defendant Apex Choice transmitted and transferred at least $500,000.00, which

promoted prohibited activities under Section 104(a) of NKSPEA.

137.    Defendant Apex Choice transmitted and transferred at least $1,000,000.00

involving prohibited correspondent banking transactions, which promoted violations of 18 U.S.C.

§ 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud).

138.    Defendant Apex Choice acted individually and with others, known and unknown,

to transmit and transfer funds to a place inside the United States from or through a place outside

the United States, and to a place outside the United States from or through a place inside the United

States, with the intent to promote the carrying on of violations of the penalties section of IEEPA,

18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud), and the

prohibited conduct under Section 104(a) of NKSPEA, in violation of 18 U.S.C. § 1956(a)(2)(A)).

139.    Defendant Apex Choice and others, known and unknown, conspired together to

commit violations of 18 U.S.C. §§ 1956(a)(2)(A), in violation of 18 U.S.C. § 1956(h).

140.    Accordingly, the Court should impose monetary penalties against Defendant Apex Choice for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

## COUNT FOUR – MONEY LAUNDERING MONETARY PENALTIES
(Against Defendant Yuanye Wood; 18 U.S.C. § 1956(b))

141.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 117 above as if fully set forth herein.

142.    Defendant Yuanye Wood transmitted and transferred at least $1,000,000.00, which transactions violated the penalties section of IEEPA.

143.    Defendant Yuanye Wood transmitted and transferred at least $100,000.00, which promoted prohibited activities under Section 104(a) of NKSPEA.

144.    Defendant Yuanye Wood transmitted and transferred at least $1,000,000.00 involving prohibited correspondent banking transactions, which promoted violations of 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud).

145.    Defendant Yuanye Wood acted individually and with others, known and unknown, to transmit and transfer funds to a place inside the United States from or through a place outside the United States, and to a place outside the United States from or through a place inside the United States, with the intent to promote the carrying on of violations of the penalties section of IEEPA, 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud), and the prohibited conduct under Section 104(a) of NKSPEA, in violation of 18 U.S.C. § 1956(a)(2)(A)).

146.    Defendant Yuanye Wood and others, known and unknown, conspired together to commit violations of 18 U.S.C. §§ 1956(a)(2)(A), in violation of 18 U.S.C. § 1956(h).

147.    Accordingly, the Court should impose monetary penalties against Defendant Yuanye Wood for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays as follows:

A.    that notice issue on the Defendant Funds as described above;

B.    that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

C.    that a warrant of arrest *in rem* issue according to law;

D.    that judgment be entered declaring that the Defendant Funds be forfeited to the United States of America for disposition according to law;

E.    that a monetary penalty be entered against the Defendant Entities in favor of the United States in the amount of the funds and monetary instruments involved in the transactions described above to be determined at trial; and

F.    that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

JESSIE K. LIU,
United States Attorney

By:    _____/s/_____

Zia M. Faruqui, D.C. Bar No. 494990
Arvind K. Lal
Brian P. Hudak
Assistant United States Attorneys
555 Fourth Street, NW
Washington, DC 20530; (202) 252-7566 (main line)

Dated: November 26, 2018                    *Attorneys for the United States of America*

VERIFICATION

I, Benjamin Whitley, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 26th day of November, 2018.


_____ */s/ Benjamin Whitley* __
Benjamin Whitley
Special Agent
Federal Bureau of Investigation

## CIVIL COVER SHEET

JS-44 (Rev. 5/12 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | $599,930.00 OF FUNDS ASSOCIATED WITH COOPERATING COMPANY 1, ET AL. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Zia Faruqui, Assistant U.S. Attorney
U.S. Attorney's Office for the District of Columbia
555 Fourth Street, N.W.
Washington, D.C.  20530

ATTORNEYS (IF KNOWN)

Ian Li, Esq.
Law Office of James Tam
428 S. Atlantic Blvd. Suite 305
Monterey Park, CA 91754

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ⦿ 1 U.S. Government Plaintiff
- ◯ 2 U.S. Government Defendant
- ◯ 3 Federal Question (U.S. Government Not a Party)
- ◯ 4 Diversity (Indicate Citizenship of Parties in item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ◯ 1 | ◯ 1 | Incorporated or Principal Place of Business in This State | ◯ 4 | ◯ 4 |
| Citizen of Another State | ◯ 2 | ◯ 2 | Incorporated and Principal Place of Business in This State | ◯ 5 | ◯ 5 |
| Citizen or Subject of a Foreign Country | ◯ 3 | ◯ 3 | Foreign Nation | ◯ 6 | ◯ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

◯ **A.** *Antitrust*

☐ 410  Antitrust

◯ **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Product Liability

◯ **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**Other Statutes**
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

◯ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

◉ **E.** *General Civil (Other)*     OR     ◯ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 27 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Conditions
☐ 560 Civil Detainee – Conditions of Confinement

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 625 Drug Related Seizure of Property 21 USC 881
☒ 690 Other

**Other Statutes**
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions
☐ 470 Racketeer Influenced & Corrupt Organization

☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 850 Securities/Commodities/ Exchange
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| **G.  *Habeas Corpus/ 2255*** | **H.  *Employment Discrimination*** | **I.  *FOIA/Privacy Act*** | **J.  *Student Loan*** |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| **K.  *Labor/ERISA (non-employment)*** | **L.  *Other Civil Rights (non-employment)*** | **M.  *Contract*** | **N.  *Three-Judge Court*** |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding  ☐ 2 Remand from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multi-district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
18 U.S.C. § 554(a), 18 U.S.C. § 981(a)(1)(C), and 18 U.S.C. § 1956 - money laundering and export control violations

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $**<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☐   NO ☒ |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☒   NO ☐ | If yes, please complete related case form |
|---|---|---|---|

DATE: ___11/26/2018___     SIGNATURE OF ATTORNEY OF RECORD     /s/Zia Faruqui

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.  CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should endure the accuracy of the information provided prior to signing the form.