**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-cv-2746 (RC) |
| | : | | |
| v. | : | Re Document No.: | 44 |
| | : | | |
| $599,930.00 OF FUNDS ASSOCIATED | : | | |
| WITH COOPERATING COMPANY 1, | : | | |
| | : | | |
| $845,130.00 OF FUNDS ASSOCIATED | : | | |
| WITH APEX CHOICE LTD., | : | | |
| | : | | |
| $1,722,723.00 OF FUNDS ASSOCIATED | : | | |
| WITH YUANYE WOOD CO. LTD., | : | | |
| | : | | |
| Defendants *In Rem*, and | : | | |
| | : | | |
| APEX CHOICE LTD., | : | | |
| | : | | |
| YUANYE WOOD LTD., | : | | |
| | : | | |
| Defendants *In Personam*. | : | | |

## <u>MEMORANDUM OPINION</u>

### GRANTING PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AS TO DEFENDANT FUNDS 1 AND 3

## I.  INTRODUCTION

This action arises out of an investigation by the Federal Bureau of Investigation ("FBI").

Plaintiff United States of America ("the Government") seeks the forfeiture of $599,930.00 of

funds associated with Cooperating Company 1 ("Defendant Funds 1") and $1,722,723.00 of

funds associated with Yuanye Wood Co. Ltd. ("Defendant Funds 3") (collectively

$2,322,653.00, "Defendant Funds").[1]  The FBI believes that North Korean entities used front companies to transact Defendant Funds in violation of U.S. economic sanctions.  No claimant to Defendant Funds has responded to the Complaint, and on May 10, 2021, the Clerk of the Court entered default against Defendant Funds.  The Government now asks this Court for default judgment.  For the reasons set forth below, the Court grants this motion.

## II.  BACKGROUND

Cooperating Company I and Yuanye Wood are alleged front companies involved in a scheme to launder U.S.-dollar payments on behalf of the Democratic People's Republic of Korea ("North Korea") and sanctioned North Korean financial institutions.  *See* Compl. ¶¶ 1–4, ECF No. 1.  The Government alleges that these front companies conducted transactions violating (1) the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq*., (2) the North Korea Sanctions and Policy Enhancement Act of 2016 ("NKSPEA"), 22 U.S.C. § 9201, *et seq*., (3) the federal anti-money laundering statute, 18 U.S.C. § 1956(a)(2)(A), (h), and (4) the conspiracy statute, 18 U.S.C. § 371 (in conspiring to commit the first three offenses).  *Id.* ¶ 5.  These transactions allegedly included or relate to Defendant Funds, and thus the Government argues that the funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (C), and (I).  *Id.* ¶ 6.

---

[1] This action originally included $845,130.00 of funds associated with Apex Choice, Ltd. ("Defendant Funds 2").  Compl. at 1–2.  The Government filed a stipulation to dismiss its *in rem* and *in personam* claims against Defendant Apex Choice, Ltd., and associated funds.  Stipulation of Partial Dismissal, ECF No. 41.  The action also included an *in personam* claim against Yuanye Wood for monetary penalties; the Government filed a notice to dismiss this claim.  Notice of Partial Dismissal, ECF No. 42.  Accordingly, the Government only requests default judgment against the remaining *in rem* claims for forfeiture of Defendant Funds 1 and 3, associated with Cooperating Company 1 and Yuanye Wood, respectively.  *Id.*

The Government specifically requests default judgment arguing that (1) Defendant Funds 1 and 3 were involved in money laundering offenses (or conspiracy to launder money) and (2) Defendant Funds 3 are proceeds of IEEPA violations (or conspiracy to evade the IEEPA sanctions). *See* Mem. Supp. Mot. Default J. ("Mot.") at 14, 16, ECF No. 44-1. The Court thus focuses on these two claims. The Court will first summarize the relevant law, then describe the alleged money laundering scheme.

### A. Statutory Framework

#### 1. The Federal Anti-Money Laundering Statute

The federal anti-money laundering statute criminalizes transporting, transmitting, or transferring funds in or out of the United States "with the intent to promote the carrying on of specified unlawful activity," or conspiring to do so. 18 U.S.C. § 1956(a)(2)(A), (h). The statute defines "specified unlawful activity" to include a wide breadth of violations, including (pertinent here) violations of the IEEPA, *id.* § 1956(c)(7)(D), wire fraud, *id.* §§ 1956(c)(7)(A), 1961(1), and bank fraud, *id.* Any property involved in a money laundering attempt or violation is subject to civil forfeiture. *See id.* § 981(a)(1)(A). To show that the property was "involved in" such a violation, the Government must show "a substantial connection between the property and the offense." *Id.* § 983(c)(3).

#### 2. The International Emergency Economic Powers Act

The IEEPA authorizes the President to impose economic sanctions in response to "any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States" originating outside the country. 50 U.S.C. §§ 1701(a), 1702(a). To activate these powers, the President must declare a national emergency with respect to the threat. *Id.* On November 14, 1994, President Clinton declared a national emergency regarding the proliferation

of weapons of mass destruction ("WMDs").  Exec. Order No. 12,938, 59 Fed. Reg. 58,099 (Nov. 14, 1994).  In 2008, President Bush declared North Korea's proliferation of WMDs a national emergency, *see* Exec. Order No. 13,466, 73 Fed. Reg. 36,787 (June 26, 2008), and the successive Presidents of the United States have renewed and expanded upon this declaration annually, most recently in June of 2021, *see, e.g.*, 86 Fed. Reg. 33,075 (June 21, 2021).

In 2005, exercising his IEEPA authority, President Bush issued Executive Order 13,382 denying access to the United States banking system to anyone designated as a "proliferator" of WMDs.  Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005).  The "WMD Proliferators Sanctions Regulations," which implement Executive Order 13,382, block any property interests, including money and other financial instruments, belonging to or used in support of individuals and entities designated as WMD proliferators.  31 C.F.R. §§ 544.201, 544.308.

The Treasury Department's Office of Foreign Assets Control ("OFAC") places individuals determined to be proliferators on the Specially Designated Nationals and Blocked Persons List (the "SDN" list).  *Id.*  There are several consequences that flow from an SDN designation.  In addition to blocking property interests belonging to or supporting SDNs, *id.* § 544.201, an OFAC designation further prohibits U.S. and non-U.S. persons from facilitating the "provision of funds, goods, or services by, to, or for the benefit of any" designated entity, unless OFAC specifically licenses the transaction, *id.* § 544.201(b)(1); *see also id.* §§ 544.202(c), 544.301, 544.405.

Additionally, the "North Korea Sanctions Regulations" prohibit transactions in the U.S. that support the Government of North Korea or the Workers' Party of North Korea.  Pursuant to Executive Order 13,687, the regulations block property and funds in the United States belonging

to any person who is "owned or controlled by" or who has "acted or purported to act for or on behalf of, directly or indirectly, the Government of North Korea."  31 C.F.R. § 510.201(a)(3)(iii)(E).  The regulations further block property belonging to persons owned or controlled by any other person whose interests and property are blocked pursuant to the regulations, *see id.* §§ 510.201(a)(3)(ii)(F), 510.201(a)(3)(iii)(E), and property belonging to any person who provided financial support to other designated persons, *see id.* §§ 510.201(a)(3)(ii)(E) (citing Exec. Order 13,551), 510.201(a)(3)(iv)(E).

After North Korea executed a ballistic missile test in 2016, President Obama issued Executive Order 13,722, which took additional steps to strengthen sanctions, including prohibiting the transfer of property or interests in property that are associated with human rights violations committed by North Korea or any entities acting on its behalf.  Exec. Order No. 13,722, 81 Fed. Reg. 14,943 (Mar. 15, 2016).

Section 206 of the IEEPA makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the statute.  50 U.S.C. § 1705(a).  Property "which constitutes or is derived from proceeds traceable to" an IEEPA violation is subject to civil forfeiture.  18 U.S.C. § 981(a)(1)(C).  "This chain of interlocking statutes can thus be summarized as follows: property that 'constitutes or is derived from proceeds traceable to' violations of executive orders and [regulations] promulgated pursuant to the IEEPA is subject to forfeiture."  *In re 650 Fifth Avenue & Related Props.*, 830 F.3d 66, 87 (2d Cir. 2016) (citing 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(D); 50 U.S.C. § 1705).

**B.  Relevant Facts and Procedural History**

1.  North Korea's Sanctions-Evasion Scheme

The Government outlines a money laundering scheme operated by state-run North Korean banks to access the U.S. financial system and support North Korea's proliferation of WMDs in violation of U.S. and international sanctions.  Due to North Korea's continued pursuit of nuclear weapons, the United Nations Security Council unanimously approved a resolution requiring all U.N. member states to prohibit financial institutions from doing business with North Korean banks.  Compl. ¶ 42.  Because North Korea is thus cut off from the international financial system, its state-controlled financial institutions allegedly operate a network of front companies to circumvent sanctions and conduct international financial transactions to fund the development of nuclear weapons.  *Id.* ¶¶ 43–46.

One such institution is North Korea's state-owned Foreign Trade Bank ("FTB"), which OFAC designated in 2013 as "a key financial node in North Korea's WMD apparatus" that North Korea uses to facilitate millions of dollars in transactions on behalf of actors linked to the proliferation network.  *Id.* ¶¶ 47, 49.  The Financial Crimes Enforcement Network ("FinCEN") also reports that the FTB has laundered "millions of U.S. dollars" evading U.S. sanctions.  *Id.* ¶¶ 51–52.  FinCEN and the U.N. Panel of Experts highlight the FTB's reliance on front companies of other nationalities and offshore bank accounts to facilitate the scheme.  *Id.* ¶¶ 53–59.  Here, the Government alleges that Defendant Funds are comprised of transactions conducted by such front companies and other affiliates of the FTB.

2.  Cooperating Company 1 and Defendant Funds 1

The Government alleges that Cooperating Company 1, purportedly headquartered in Singapore, conspired with a Chinese money remitter to make numerous wire transfers to a front company.  Mot. at 3.  The Government describes the following scheme.

Cooperating Company 1 worked with an unauthorized Chinese money remitter to convert U.S. dollars to Chinese Renminbi at a reduced currency exchange service cost.  Compl. ¶¶ 82, 85.  The money remitter directed Cooperating Company 1 to make numerous U.S.-dollar payments to third party companies with whom Cooperating Company 1 did not have a business relationship.  *Id.* ¶ 82.  So long as Cooperating Company 1 continued making those payments, the remitter would make equivalent deposits in Chinese Renminbi to Cooperating Company 1's affiliate Chinese bank account.  *Id.* ¶ 84.  Cooperating Company 1 failed to conduct due diligence on the third parties it paid.  *Id.* ¶ 87.

Two of the transactions that the remitter directed Cooperating Company 1 to make were $300,000.00 wires to Front Company 1 in May 2017.  *Id.* ¶¶ 66, 85.  Over the next seven days, Front Company 1 transferred over $3 million to Velmur Management Pte. Ltd.  *Id.* ¶¶ 66, 81, 86. Velmur is an SDN that was designated by OFAC for supplying gasoil to North Korea, *id.* ¶ 60, and is allegedly a front company for the FTB, *id.* ¶ 61.  The wires from Front Company 1 to Velmur noted in the reference field, "Prepayment for Gasoil."  *Id.*  ¶ 67.

In total, Cooperating Company 1 paid Front Company 1 $600,000.00.  *Id.* ¶ 86.  Minus transaction fees, the remaining $599,930.00 of this sum constitutes Defendant Funds 1.  *Id.*  The Government did not freeze the original transaction; rather, Cooperating Company 1 has paid the equivalent amount to a settlement fund and has agreed not to contest the forfeiture of these funds.  *Id.* ¶ 88; *see* Mot. at 3–4; Decl. of Publication at 2, ECF No. 10.

3.   Yuanye Wood and Defendant Funds 3

The Government alleges that Yuanye Wood, purportedly headquartered in Wenzhou, China, acted as a dealer of foreign currency or a money transmitter and made more than $2 million in illicit payments to OFAC-designated front companies supporting the North Korean government.  Compl. ¶¶ 103–18; Mot. at 3.  The Government adds that Yuanye Wood does not appear to have a physical office at its address in the Seychelles, which is apparently used by numerous other companies.  Compl. ¶ 104.

Specifically, the Government alleges that Yuanye Wood acted at the direction of Chilbo Wood Company to make layered transactions in U.S. dollars to support North Korean nationals while evading detection by U.S. banks.  *Id.* ¶¶ 112, 114, 116.  Chilbo was a North Korean wood-harvesting operation in Equatorial Guinea that allegedly exported workers from North Korea.  *Id.* ¶ 107.  In general, the U.S. Department of State has reported that North Korea's exportation of workers often amounts to forced labor.  *Id.* ¶ 109.  The U.S. Treasury Department and the U.N. Security Council have acknowledged that North Korea uses some revenue from forced labor to fund the development of nuclear weapons.  *Id.* ¶ 108.  The Government points out that Equatorial Guinea began repatriating North Korean "laborers" in 2018 after a U.N. sanctions report that specifically named Chilbo.  *Id.* ¶ 111.

The Government identifies three sets of transactions allegedly directed by Chilbo.  First, the Government identifies that Yuanye Wood wired $100,000.00 to Front Company 7 in October 2016, and this wire was referenced "Chilbo."  *Id.* ¶ 106.  Front Company 7 purportedly also received over $1.6 million in payments from known FTB front companies in October and November of 2016.  *Id.* ¶ 105.  Second, the Government alleges that a confidential source, "CS-3[,] revealed a communication from a North Korean procurement agent that confirmed that

Yuanye Wood" paid Wee Tiong Pte. Ltd. $99,980.00 in February 2017.  *Id.* ¶ 113.  OFAC designated Wee Tiong in 2018 for laundering millions of dollars through the U.S. on behalf of North Korea by "obfuscat[ing] payment origins and structur[ing] transactions to avoid regulatory scrutiny."  *Id.* ¶ 77.

Third, the Government alleges that Yuanye Wood wired six payments totaling $800,000.00 to Front Company 4 in 2016 and 2017.  *Id.* ¶¶ 76, 115.  From 2011 to 2017, Front Company 4 also received over $3 million from the Dandong Zhicheng Network.  *Id.*  OFAC designated Dandong Zhicheng Network for its trade and transactions supporting North Korea's nuclear weapons program, *id.* ¶ 71, and this Court previously found that Dandong Zhicheng laundered money on behalf of the FTB, *id.* ¶¶ 71–73.

Last, the Government adds that a confidential source, "CS-1," revealed that an FTB representative directed payments from Front Company 5 to Front Company 7, Wee Tiong, and Velmur.  *Id.* ¶¶ 79–80.

Defendant Funds 3 consist of $1,722,723.00 of subsequent wires that Yuanye Wood attempted to transact through the U.S. financial system "as part of this scheme."  *Id.* ¶ 119; Mot. at 4.  These funds were seized in December 2018 and are held in two parts—$1,487,034 with Wells Fargo Bank and $235,689 with J.P. Morgan Chase.  Mot. at 4.

### 4.  Procedural History

Following an FBI investigation, the United States filed an action against Defendant Funds and their potential claimants in November 2018.  As of May 14, 2021, the *in rem* claim against Defendant Funds 2, the *in personam* claim against Apex Choice, and the *in personam* claim against Yuanye Wood have been dismissed.  *See* Stipulation of Partial Dismissal; Notice of Partial Dismissal.

Within one week of filing the Complaint, the Government sent notice to all known potential claimants with respect to Defendant Funds 3 (associated with Yuanye Wood), via FedEx.  Mot. at 5; *see also* Warrant for Arrest, ECF No. 3.  The known claimant to Defendant Funds 1 (Cooperating Company 1), agreed to a settlement with the Government and waived notice, and consequently, the Government did not serve direct notice on them.  *See* Mot. at 5; Decl. Supp. Default Against Def. Funds 1 & 3 ("Decl. Supp. Default") ¶ 6, ECF No. 38.  The Government also posted notice of the seizures to the official government forfeiture website (www.forfeiture.gov).  *See* Decl. of Publication.  No parties filed claims to Defendant Funds by the deadline, and the Clerk of Court subsequently entered default against them.  *See* Clerk's Entry of Default as to $1,722,723.00 of Funds Associated with Yuanye Wood Co Ltd, $599,930.00 of Funds Associated with Cooperating Company 1 ("Clerk's Default"), ECF No. 39; *see also* Decl. Supp. Default.  The Government now requests that the Court enter default judgment for forfeiture of Defendant Funds.

### III.  LEGAL STANDARD

Default is appropriate for forfeiture actions.  *United States v. All Assets Held in Account No. XXXXXXX*, 330 F. Supp. 3d 150, 155–56 (D.D.C. 2018).  Under the Federal Rules of Civil Procedure, a moving party must embark on a two-step process to gain relief through default judgment.  First, the party must request that the Clerk of the Court enter default against a party that has failed to plead or otherwise defend against claims.  Fed. R. Civ. P. 55(a).  "Unless a claimant properly intervenes to raise defenses to its forfeiture, the defendant property is deemed to have 'failed to plead or otherwise defend' against the allegations, and the Clerk of Court must enter default."  *All Assets Held in Account No. XXXXXXX*, 330 F. Supp. 3d at 156.

Second, the plaintiff must apply to the court to enter default judgment.  Fed. R. Civ. P. 55(b)(2).  While "[t]he Clerk's entry of default establishe[d] the defendant's liability for the well-pleaded allegations of the complaint," *United States v. Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d 1, 4 (D.D.C. 2020), the court must establish that these allegations are legally sufficient to state a claim, *Gutierrez v. Berg Contracting Inc.*, No. 99-cv-3044 (TAF), 2000 WL 331721, at *2 (D.D.C. Mar. 20, 2000).

Default judgment is typically "available only when the adversary process has been halted because of an essentially unresponsive party.  In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)); *see also Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 965 (D.C. Cir. 2016).  However, "a defendant's failure to appear . . . do[es] not automatically entitle plaintiff to a default judgment." *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26 (D.D.C. 2008) (cleaned up).  Rather, "the defendants' default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief." *Id.* at 27 (quoting *Descent v. Kolitsidas*, 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005)).  In other words, "[d]efault establishes the defaulting party's liability for the well-pleaded allegations of the complaint," but not for allegations that are not sufficiently pleaded.  *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011) (citing *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001)).

## IV.  ANALYSIS

Rule G of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions governs *in rem* civil forfeiture actions arising from federal statutes.  Fed. R.

Civ. P. Supp. R. G(1).  Supplemental Rule G contains both notice and substantive pleading

requirements.[2]  Fed. R. Civ. P. Supp. R. G(2), (4).  Because the Government has given sufficient

notice and has filed an adequate complaint, the Court grants this motion.

### A.  Notice

To satisfy the notice requirements, the Government must (1) publish public notice of a

forfeiture action and (2) directly serve notice on "any person who reasonably appears to be a

potential claimant."  Fed. R. Civ. P. Supp. R. G(4)(a)–(b).

The public notice should "describe the property with reasonable particularity," "state the

times . . . to file a claim and to answer," and "name the government attorney to be served with

the claim and answer."  Fed. R. Civ. P. Supp. R. G(4)(a)(ii)(A)–(C).  One acceptable method of

public notice is publication on an official government forfeiture website for at least thirty

consecutive days.  Fed. R. Civ. P. Supp. R. G(4)(a)(iv)(C).

Here, the Government satisfied the public notice requirement by posting on

www.forfeiture.gov for thirty consecutive days, beginning on December 31, 2018, through

January 29, 2019.  *See* Decl. of Publication at 1, 4; Mot. at 5.  The public notice described the

funds with the dollar amount of each frozen transaction, the persons from whom the funds were

seized, the originating bank accounts, the bank and account information describing where each

frozen amount is currently held, and the date of each seizure.  Decl. of Publication at 2–3.

---

[2] Supplemental Rule G also requires that if—as is the case here—the subject of the seizure is not real property, the "clerk must issue a warrant to arrest the property if it is in the government's possession, custody, or control."  Fed. R. Civ. P. Supp. R. G(3)(b)(i).  The funds at issue here are in the government's control.  *See* Warrant for Arrest; Decl. of Publication (providing bank account information for each of the seized transactions).  The Clerk of Court issued a warrant for the funds' arrest in December 2018.  Warrant for Arrest.  The Government has thus met this Supplemental Rule G requirement.

Further, the Government specified the deadlines by which potential claimants must file a claim and answer the complaint, and the Government named the Assistant U.S. Attorney to be served. *Id.* at 3.  The Government thus satisfied Supplemental Rule G's public notice requirements.

The Government must also "send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant."  Fed. R. Civ. P. Supp. R. G(4)(b)(i). This direct notice must contain "the date when the notice is sent," the "deadline for filing a claim, at least 35 days after the notice is sent," "that an answer or a motion under Rule 12 must be filed no later than 21 days after filing the claim," and "the name of the government attorney to be served."  Fed. R. Civ. P. Supp. R. G(4)(b)(ii)(A)–(D).  Finally, the rule requires only "that the government attempt to provide actual notice; it does not require that the government demonstrate that it was successful in providing actual notice."  *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38, 47 (D.D.C. 2018) (quoting *Mesa Valderrama v. United States*, 417 F.3d 1189, 1197 (11th Cir. 2005)).

The Government satisfied the direct notice requirements.  Cooperating Company 1 was the only known potential claimant to Defendant Funds 1 and waived notice.  Decl. Supp. Default at 2; *see United States v. $156,000,000 in U.S. Currency*, No. 15-cv-1732, 2016 WL 659670, at *1 (D.D.C. Feb. 18, 2016) (holding that no direct notice is needed when the known potential claimant waived notice as part of a settlement with the government).  Regarding Defendant Funds 3, the Government identified Yuanye Wood as the only potential claimant and sent direct notice via FedEx "[o]n or about November 30, 2018."  Decl. Supp. Default at 3.  In a supplemental declaration, the attorney of record for the Government states that the direct notice included a copy of the verified complaint, the date the Government sent the notice, that any claim must be filed within 35 days of the notice being sent, that answers or motions under Rule

12 must be served within 21 days of filing claims, and the name of the Government attorney to be served. Suppl. Decl. Supp. Default ¶ 5, ECF No. 46-1. The Court finds that the Government satisfied the notice requirements.

### B. Adequacy of the Complaint

Supplemental Rule G's substantive pleading specifications require that the complaint (1) is verified, (2) states the grounds for jurisdiction and venue, (3) describes the property with reasonable particularity, (4) identifies the statute under which the forfeiture action is brought, and (5) states sufficiently detailed facts to support a reasonable belief that the government would be able to meet its burden of proof at trial. Fed. R. Civ. P. Supp. R. G(2). Courts consider this a "higher standard of pleading" than Federal Rule of Civil Procedure 8, *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008), but Rule 8 might help to clarify if a civil forfeiture complaint states a claim, *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 249 (S.D.N.Y. 2010).

The first four elements are mostly formal and are easily met here. First, the Complaint is verified. *See* Compl. Second, it identifies as grounds for subject matter and *in rem* jurisdiction that Defendant Funds are currently held in U.S. bank accounts, and as grounds for venue that the IEEPA offenses underlying the money laundering claims occurred when potential claimants did not seek licenses from OFAC, which is in Washington, D.C. *Id.* ¶¶ 8–9. Third, the Complaint describes the dollar amount, wire transfer details, and potential claimants for both Defendant Funds, thus describing the property at issue with "reasonable particularity." *Id.* at 1–2; *see also* Decl. of Publication at 2–3. Fourth, the Complaint identifies the statutory avenues by which the Government might be entitled to asset forfeiture. *See supra* Section II.

The fifth and final element requires the Government to establish a legal basis for its claims.  The Government moves for default judgment specifically on the theories that (1) Defendant Funds 1 and 3 are forfeitable as funds involved in money laundering offenses and (2) Defendant Funds 3 are additionally forfeitable as proceeds derived from or traceable to IEEPA violations.  The Government must "state sufficiently detailed facts to support a reasonable belief that" it can meet its burden at trial to show these statutory violations occurred. Fed. R. Civ. P. Supp. R. G(2)(f).  This is not "an onerous standard."  *United States v. Aguilar*, 782 F. 3d 1101, 1108–09 (9th Cir. 2015).  The Court finds that the Government has established a legal basis for its money laundering claims, and thus the Government meets the substantive pleading requirements.

1.  Money Laundering Violation

The Government claims that Defendant Funds 1 and 3 are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) as funds involved in money laundering offenses.  To prove such a violation, the Government must show "an overseas transfer with the intent to promote the carrying on of specified unlawful activity."  *United States v. Tajideen*, 319 F. Supp. 3d 445, 467–68 (D.D.C. 2018) (quotations omitted) (quoting *United States v. Piervinanzi*, 23 F.3d 670 (2d Cir. 1994)).  To show that a money laundering violation warrants forfeiture, the Government must also show "a substantial connection between the [funds] and the offense."  18 U.S.C. § 983(c)(3).

Here, the Government identifies that Cooperating Company 1, headquartered in Singapore, routed $600,000.00 in U.S. dollars to Front Company 1.  Compl. ¶ 66; Mot. at 3. This sum was purportedly destined for North Korea via OFAC-designated Velmur.  *See* Compl. ¶¶ 66, 81, 86.  The Government similarly identifies that China-based Yuanye Wood made

several U.S.-dollar payments to OFAC-designated Wee Tiong, Front Company 7, and Front Company 4, the latter two with alleged ties to North Korean SDNs. Compl. ¶¶ 76–77, 103–18; Mot. at 3. These transactions constitute "overseas transfers" that trigger the money laundering statute.

Next, the Government argues that the transactions constituted the following unlawful activities: (1) violations of the IEEPA, (2) wire fraud, and (3) bank fraud. Any of these underlying activities would suffice for a money laundering offense. *See* 18 U.S.C. §§ 1956(c)(7)(A), (D), 1961(1). The Government must sufficiently allege "intent to promote" one of these underlying offenses. *See United States v. Brown*, 186 F.3d 661, 670 (5th Cir. 1999) ("Section 1956(a)(1)(A)(i) is not satisfied by a showing that a financial transaction . . . merely promoted the carrying on of unlawful activity. The provision has a specific intent element.").

The Court finds that the Government sufficiently alleges that the identified transactions were conducted with the intent to promote IEEPA violations. Per the Statutory and Regulatory Framework detailed above, *supra* Section II.A.2, the IEEPA entails that "[a]ny entity that transacts with or on behalf of . . . North Korean SDNs, through the United States financial system, must first obtain a license from OFAC."[3] *United States v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte. Ltd.*, 368 F. Supp. 3d 10, 19 (D.D.C. 2019) (citing 31 C.F.R.

---

[3] The Government initially suggested the following test for a civil IEEPA violation: "the United States must allege: (1) an illegal export or provision of services; (2) failure to obtain the necessary license from OFAC; and (3) the defendant knew that a license was required." *See* Mot. at 16–17 (citing *United States v. Quinn*, 403 F. Supp. 2d 57, 65 (D.D.C. 2005) (criminal); *United States v. All Funds on Deposit in United Bank of Switzerland*, No. 01 Civ. 2091, 2003 WL 56999, at *2 (S.D.N.Y. Jan. 7, 2003) (civil)). This argument fails to properly describe the case law presented (for example, the court in *Quinn* rejected this test, 403 F. Supp. 2d at 65), and it also reflects an unnecessarily restrictive view of the IEEPA sanctions for the present case by limiting the language to "an illegal export or provision of services." Additionally, the Government subsequently acknowledged that there is no *mens rea* requirement for a civil IEEPA violation. *See* Suppl. Mem. L. Supp. Mot. Default J. at 3–4, ECF No. 46.

§ 544.201(a)); *see United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Co.*, Nos. 17-mj-217, et al., 2017 WL 3233062, at *1, *5 (D.D.C. May 22, 2017) (explaining that foreign entities that are acting on behalf of North Korean SDNs have committed violations of IEEPA and the anti-money laundering statute).

In similar cases, this Court has suggested that a transfer of U.S. dollars by or on behalf of an SDN without an OFAC license, in violation of the IEEPA, presumptively violates the money laundering statute. In *Velmur*, the Government met its default judgment burden for an IEEPA violation by alleging (1) the overall scheme by North Korean banks to subvert U.S. sanctions, (2) the potential claimants' involvement in this scheme, (3) details of the transactions involving the defendant funds, and (4) that certain sources could confirm the illicit activities. *See Velmur*, 368 F. Supp. 3d at 20. Here, the Government points to the same scheme by North Korean financial institutions, *see supra* Section II.B.1, which it supports with findings from FinCEN, the U.N. Panel of Experts, and U.S. agencies. Next, the Government alleges the involvement of Cooperating Company 1 and Yuanye Wood, along with their respective Defendant Funds. Notably, a confidential source, "CS-1," revealed that Front Companies 5 and 7, Wee Tiong, and Velmur all transacted under the direction of an FTB representative, Compl. ¶¶ 79–80, suggesting a connection between various parties of the transactions here and the broader North Korean sanctions evasion and money laundering scheme.

Regarding Cooperating Company 1 and Defendant Funds 1, the Court first notes that Cooperating Company 1 agreed not to contest the forfeiture. *Id.* ¶ 88. It appears that Cooperating Company 1 contributed to North Korea's sanctions evasion scheme when it worked with a Chinese money remitter to convert currency and made U.S.-dollar payments to third parties at the money remitter's direction. *See id.* ¶¶ 82, 85. In May 2017, under the money

remitter's direction, Cooperating Company 1 transferred $600,000.00 to Front Company 1, and shortly afterward, Front Company 1 transferred over $3 million to Velmur. *Id.* ¶ 66. Together, the allegations present this chain of events: Cooperating Company 1 transacted with Front Company 1 and at the direction of the Chinese money remitter, both of whom support an SDN. No OFAC licensing was sought for the transactions. The Court accepts that this clear IEEPA violation is sufficient to establish liability for money laundering. *See Dandong Zhicheng Metallic Material Co.*, 2017 WL 3233062, at *1, *5.

Additionally, Defendant Funds 1 have a "substantial connection" to the money laundering offense to warrant forfeiture. Cooperating Company 1 paid this sum of $599,930.00 into a settlement fund to match the funds it paid to Front Company 1. Mot. at 3–4. This satisfies the "substantial connection" needed to conclude that the property was involved in a money laundering violation. *See* 18 U.S.C. §§ 981(a)(1)(A), 983(c)(3). As Cooperating Company 1 is a direct source of the information presented and does not contest forfeiture, the Court finds that the Government has established a reasonable belief that it would meet its burden of proof at trial.

Regarding Yuanye Wood and Defendant Funds 3, the Court again finds that the Government sufficiently alleges a money laundering violation premised on the IEEPA. Specifically, the Government alleges that a North Korean company, Chilbo, directed Yuanye Wood's transactions. Compl. ¶¶ 112, 114, 116. North Korea's exportation of workers for forced labor is recognized by the U.N. as well as U.S. federal agencies, and the U.N. has recognized Chilbo as one of the North Korean companies engaging in such practices. *Id.* ¶¶ 108–11. If true, this would implicate Executive Order 13,722, which (under the IEEPA) prohibits trade and transactions associated with human rights violations committed by North Korean entities. Exec. Order No. 13,722, 81 Fed. Reg. 14,943 (Mar. 15, 2016). Additionally, both the U.N. and U.S.

recognize that revenue from exported labor is used to fund North Korea's development of nuclear weapons.  Compl. ¶¶ 108–09.  Accordingly, transactions on behalf of Chilbo would violate several additional IEEPA regulations, including the WMD Proliferators Sanctions Regulations.  *See* 31 C.F.R §§ 544.201, 544.308.  Chilbo's alleged connection to North Korea's human rights violations and the weapons development program satisfies the mere indirect connection required by the North Korea Sanctions Regulations.  *See* 31 C.F.R. § 510.201(a)(3)(iii).

The Government supports the contention that Chilbo directed Yuanye Wood's payments mainly by pointing to a $100,000.00 wire from Yuanye Wood to Front Company 7 that referenced "Chilbo."  Compl. ¶¶ 105–06.  While the Government does not delineate how it knows that each of the other transactions are connected to Chilbo, the Government alleges other facts supporting the illicit nature of those transactions.  For example, a confidential source, named "CS-3[,] revealed a communication from a North Korean procurement agent" confirming Yuanye Wood's $99,980.00 payment to Wee Tiong.  *Id.* ¶ 113.  And Yuanye Wood's repeated payments to Front Company 4 appear to fall in line with a broader scheme involving the previously designated Dandong Zhicheng Network.  *See id.* ¶¶ 71–73, 76, 115.  Altogether, the Government has established a "reasonable basis" to believe it would show at trial the intent to promote IEEPA violations.

Last, Defendant Funds 3 are substantially connected to the offenses.  The Government explains that Defendant Funds 3 consist of $1,722,723.00 of subsequent U.S.-dollar wires initiated by Yuanye Wood in December 2018.  *Id.* ¶ 119; Mot. at 4.  After alleging eight illicit payments totaling approximately $1 million to Front Companies 4 and 7 and Wee Tiong, having supported these companies' connections to the money laundering scheme, and having shown that

Yuanye Wood transacts at the direction of North Korean entities, the Government has established a reasonable belief that it can show Defendant Funds 3 are part of the scheme.

The Court finds that the Government has presented enough detail to establish a reasonable belief that it would meet its burden at trial and show that Cooperating Company 1 and Yuanye Wood engaged in money laundering offenses premised on IEEPA violations.  The Government further sufficiently alleged that Defendant Funds 1 and 3 are substantially connected to these offenses, warranting their forfeiture under 18 U.S.C. § 981(a)(1)(A) as funds involved in money laundering.  The Government has thus established a legal basis for its claims.  As such, the Court does not need to address the bank fraud, wire fraud, and conspiracy arguments, which serve only as alternative avenues for relief.

### 2.  IEEPA Violation

The Government additionally argues in its Motion that Defendant Funds 3 are subject to forfeiture as proceeds derived from IEEPA violations.  The only question left is whether the funds constitute "proceeds."  Because the Court has already found the funds forfeitable based on money laundering, the Court does not need to address this question.

*                    *                    *

Under Supplemental Rule G, the Government properly notified all the potential parties and sufficiently alleged that Defendant Funds are subject to forfeiture.  Accepting the well-pleaded allegations as true, the Court finds that default judgment is appropriate on Count Two of the Complaint for forfeiture based on money laundering.

### V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Government's Motion for Default Judgment (ECF No. 44).  Judgment is entered in favor of the United States and against the

potential claimants of Defendant Funds, and Defendant Funds are forfeited to the Government.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  April 19, 2022                                      RUDOLPH CONTRERAS
                                                           United States District Judge